Noel A. LOUIS, Plaintiff,

v.

BOARD OF EDUCATION OF the CITY OF NEW YORK, Defendant.

No. 87-CV-2805 (JRB).

United States District Court,
E.D. New York.

Jan. 10, 1989.

Boyd, Staton & Cave, Brooklyn, N.Y. (Gail Boyd, of counsel), for plaintiff.

Peter Zimroth, Corp. Counsel, New York City (Julie O'Neill, Georgia Pestana, of counsel), for defendant.

MEMORANDUM–DECISION
AND ORDER

BARTELS, District Judge.

I. INTRODUCTION

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e et seq.,[1] in which the plaintiff Noel A. Louis claims that he was denied tenure as principal of Herbert Lehman High School in the Bronx on account of race, alleging that the reason for denial is that he is black. He further asserts that the reasons proffered by defendant Board of Education of the City of New York (the "Board") for the denial are wholly pretextual and are designed to disguise defendant's racial motive.

The following evidence was adduced at trial:

Plaintiff was appointed acting principal of Herbert H. Lehman High School (the "School") in April, 1972. Plaintiff was chosen to fill this position after being approved through a "circular 30R" process, a process described at trial as involving several layers of interviews conducted by committees of parents and Board of Education personnel. The ultimate decision to appoint plaintiff was made by then-Chancellor Harvey Scribner.

The School was a new school located in the Throgs Neck section of the Bronx, an area described at trial as being predominately Italian and Irish. Plaintiff was charged with the responsibility of readying the School for operation which included hiring a staff, procuring teaching materials, overseeing the proper operation of the building's physical plant, and implementing a full curriculum. The School opened in the Fall of 1972.

Approximately 60% of the student body was white; the other 40% was black and, to a lesser extent, hispanic. According to the plaintiff, after his appointment he had hostilities directed toward him from segments of the community. Plaintiff felt that the hostility stemmed from the local residents' fear that, under a black principal, the School would "tip"—i.e., have more minority students than white students. During plaintiff's time at the School its white student population decreased from 60% to approximately 56%. Principals, however, do not have the power to affect the racial make-up of their schools.

Almost immediately after opening in 1972, the School began to experience racial tension among the students, evidenced by name-calling, and exacerbated by gang violence, and by the fact that the School, since its opening, had been undergoing inter-zone busing instituted by the Board to achieve integration. Minority students were being bussed in from the South Bronx. Rumors regarding potential violence at times caused parents to keep their children at home rather than send them to school. This tension culminated in a student disturbance in March, 1973, necessitating the calling in of a "huge detail of police" and the closing of the School for a day.

After the March, 1973 incident, plaintiff instituted several programs designed to relieve racial tension. Both plaintiff and former Executive Director of the Division of High Schools from 1973 to 1978, Samuel Polatnick, testified that these programs worked, and that plaintiff was thereafter lauded by the Board for his efforts and was sought out as a speaker on alleviating racial problems within the schools. In 1974 plaintiff was appointed the licensed principal of the School by then-Chancellor Irving Anker after a testing and certification process.

In 1971 tenure for principals and assistant principals was abolished. 1971 N.Y. Laws ch. 116. In July, 1975, tenure for such positions was reestablished, 1975 N.Y. Laws ch. 468, *codified at* N.Y.Education Law § 2573 (McKinney 1985), and, as a result, untenured principals and assistant principals began serving a three year probationary period. If those persons were not expressly denied tenure by July 24,

---

**1.** Section 2000e–2 of Title 42 of the United States Code provides in pertinent part:
 It shall be an unlawful employment practice for an employer—
 (1) to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color ...; or

(2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee, because of such individual's race [or] color....
42 U.S.C. 2000e–2(a)(1) & (2).

1978, they would receive tenure by estoppel.

During the time he was principal, plaintiff's immediate supervisor was a black woman, Bertha Gordon, who was Superintendant of Bronx High Schools. While Gordon did not testify at trial, her superior, Polatnick, who reported to the Chancellor, did testify. He testified that he was satisfied by plaintiff's performance and had never received complaints about plaintiff from Gordon. In July, 1978, Gordon recommended to Polatnick that plaintiff receive tenure and Polatnick, in turn, "had no reservation" in recommending that plaintiff be granted tenure by the Chancellor. In fact, Polatnick recommended that all 43 principals then up for tenure in July, 1978, be granted tenure.

In April, 1978, Frank Macchiarola was elected by the Board to become Chancellor in June, 1978. Macchiarola testified that when he took over as Chancellor the schools were perceived as being, and were indeed, in trouble. Macchiarola was viewed as a "reform" Chancellor, and asked for and received the resignations of all of outgoing Chancellor Anker's staff. Polatnick's resignation was one of two that Macchiarola accepted immediately, and Gordon's resignation was accepted soon thereafter.

Upon taking office, Macchiarola realized that he had 24 days in which to make decisions regarding over 500 candidates for tenure. Macchiarola assembled a staff, one of whom was Nathan Quinones. Quinones was appointed Executive Director of High Schools, replacing Polatnick.

Macchiarola set his staff and the staff of Quinones to the task of assembling the personnel records of the candidates for tenure. Both Quinones and Macchiarola testified that the personnel records of the tenure candidates were in an abysmal state or mess: sometimes a candidate's records were scattered throughout the city; sometimes there were no records to be had; and often, when records could be found, they were lacking information upon which a tenure decision could be based. The records for candidates from the Bronx were in particularly poor condition. Macchiarola testified that he concentrated on getting as full a record as possible for the 43 principals that were candidates for tenure.

After the personnel records of the candidates were gathered, Quinones reviewed them and made a recommendation regarding tenure to Macchiarola. Macchiarola then reviewed the records anew and made his decision whether to grant tenure. Macchiarola's policy was not to allow tenure by estoppel; a candidate's record had to demonstrate that the right to what essentially was a lifetime job had been earned.

Both Quinones and Macchiarola stated that Macchiarola's criteria for tenure were leadership and quantifiable student achievement. The latter criterion was defined as a) the number of students graduating, b) the number of students passing New York State Board of Regents exams, c) the number of students receiving New York State Board of Regents diplomas, and d) the number of students going to college.

At trial, Quinones and Macchiarola examined evaluations of plaintiff written by Gordon in years 1973 through 1978. The evaluations were submitted as part of plaintiff's case. Although neither Quinones nor Macchiarola was able to state, some ten years after the fact, just which records were in plaintiff's file when the July, 1978 tenure decision was made, they were able to state (1) that Macchiarola had as complete a file as possible before making the decision regarding plaintiff's tenure, and (2) that, as a general matter, evaluations like those adduced at trial were in the files of the principals up for tenure. Both Quinones and Macchiarola testified that the evaluations of plaintiff did not contain information regarding plaintiff's performance which would warrant a grant of tenure for the following reasons.

First, the evaluations, which were written by Gordon and approved by Polatnick, were "empty." Both Macchiarola and Quinones expressed reservations about Gordon's and Polatnick's abilities to correctly and impartially evaluate plaintiff's performance. Macchiarola felt that Gordon's

evaluations were routine, self-complementary reports, bereft of hard data, which understated deficiencies through the use of bureaucratic language. For example, Macchiarola translated "improve, revitalize parental activity with the school" as "wholesale protests ... half a dozen meetings to arbitrate the differences between the principal and the parents," and "improve supervision," as "complaints from the teaching staff about the way the things were supervised," and "community support may be enhanced by a more approachable facade," as "difficulties in the community." Macchiarola testified that plaintiff's evaluations were as negative as such "empty" reports ever were.

Second, the evaluations were lacking the hard data regarding improvement of student performance which Macchiarola felt was indispensable to a grant of tenure. At trial there was conflicting testimony regarding student performance. Plaintiff and Polatnick testified that during plaintiff's time as principal, student performance improved: an honors program was instituted; student awards increased; and, while the minority student population increased, the dropout rate remained stable. Macchiarola, however, testified that, in July, 1978, it was his impression that student performance at the School was on the decline. At trial, neither party offered empirical data reflecting the improvement or decline of student performance while plaintiff was principal of the School.

Third, both Macchiarola and Quinones testified that, in July, 1978, they were personally possessed of knowledge regarding plaintiff which was not reflected in the evaluations introduced at trial. Quinones related that, when he was principal of South Bronx High School, he knew parents who were dissatisfied with Herbert Lehman High School and who had had their children transferred to South Bronx High School. Macchiarola testified that he too was aware of complaints that had been lodged against plaintiff. Parents had complained that plaintiff was not "in charge" of the School, and Macchiarola knew of incidents that seemed to confirm this—for instance, he knew that Gordon had had to come to the School to arbitrate disputes between plaintiff and parents. Moreover, teachers had complained that school rules were not being enforced. Macchiarola stated that he took these complaints into account when making his decision not to grant plaintiff tenure.

In a letter from Macchiarola dated July 18, 1978, plaintiff was denied tenure, and thereafter resumed his former position as assistant principal of foreign languages at George Wingate High School. Plaintiff continues to hold that position.

Plaintiff's replacement at the School was Robert Leder. Leder is a white male, and had been an assistant principal at a junior high school before assuming plaintiff's position at the School. Macchiarola appointed Leder after Leder had gone through the "circular 30R" process. Macchiarola stated that he appointed Leder because he knew Leder and was aware of Leder's qualifications and had sat on the committee that recommended Leder for the junior high school position. He was impressed with Leder at that time and felt that he would do good job at the School. After taking over plaintiff's position, Leder received tenure three years later. Macchiarola testified that the graduation rate, the retention rate, and the college acceptance rate all increased at the School after Leder's appointment.

After due consideration, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

1. Plaintiff Noel A. Louis is a black, male citizen of the United States, residing in the Eastern District of New York.

2. Defendant Board of Education of the City of New York operates and manages the schools of New York City.

3. Plaintiff was appointed acting principal of the School in April, 1972, and became principal in September, 1974.

4. In 1975, the New York State Legislature reinstated tenure for, *inter alia*, high school principals. All non-tenured high

school principals, including plaintiff, thereafter began serving a three-year probationary period that was to end July 24, 1978. If the candidates for tenure were not expressly denied tenure by that date, they would receive tenure by estoppel.

5. Bertha Gordon, Superintendant of Bronx High Schools, was plaintiff's immediate supervisor. Gordon reported to Samuel Polatnick, Executive Director of the Division of High Schools. In July, 1978, Gordon and Polatnick recommended plaintiff for tenure. Polatnick did not recommend that anyone in the Division of High Schools be denied tenure.

6. Frank Macchiarola became Chancellor in July, 1978. Macchiarola asked for, and accepted, Polatnick's and Gordon's resignations, and appointed Nathan Quinones as Executive Director of the Division of High Schools.

7. When Macchiarola came into office he had 24 days in which to make decisions regarding tenure for over 500 candidates, 43 of whom were principals. Macchiarola's staff and Quinones' staff set about collecting the personnel records of the tenure candidates so that they could be reviewed by Quinones and Macchiarola. The personnel records, in general and especially for the candidates from the Bronx, were in poor condition. For each of the 43 principals, however, Macchiarola made no tenure decision until personnel files, as complete as then possible, had been assembled for his review.

8. In the later part of July, 1978, Quinones made his recommendations regarding tenure to the Chancellor. Of the 43 principals considered for tenure, 9 were black, including plaintiff. Of these 9, Quinones recommended 6 for tenure, and recommended that the remaining 3, including plaintiff, not receive tenure.

9. In making his recommendations, Quinones considered 1) the candidate's leadership; and 2) quantifiable student achievement—i.e., the number of students graduating, the number of students passing the New York State Board of Regents exams, the number of students receiving New York State Board of Regents diplomas, and the number of students going on to college.

10. Both Quinones and Macchiarola discredited the recommendations made by Gordon and Polatnick because they felt that Gordon and Polatnick were not capable and competent judges of performance.

11. Macchiarola considered Quinones's recommendations and, after consulting the personnel files of the candidates for tenure, made his decisions regarding tenure utilizing criteria similar to those employed by Quinones. In making his decision regarding tenure Macchiarola also took into account any complaints that had been made against the candidates.

12. Macchiarola denied plaintiff tenure on July 18, 1978. He felt that plaintiff had not earned the right to what essentially was a lifetime job: plaintiff's file was bereft of data showing improvement in quantifiable student achievement, and it was Macchiarola's opinion that the School was on the decline; plaintiff's evaluations were as negative as such "empty," self-serving evaluations were; and plaintiff had had complaints lodged against him from parents and teachers.

13. All told, Macchiarola granted six of the nine black principals tenure, and denied tenure to the remaining three.

14. Plaintiff was replaced by Robert Leder, who is a white male, and had been an assistant principal at a junior high school before assuming plaintiff's position at the School. Macchiarola appointed Leder because he had been impressed with him in the past and felt that Leder would do a good job as principal of the School. The retention rate, the graduation rate, and the college acceptance rate at the School increased after Leder's appointment. Three years after his appointment as principal of the School, Leder was granted tenure.

## III. CONCLUSIONS OF LAW

Title VII claims of discrimination are evaluated under the now familiar framework established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff

must prove, by a preponderance of the evidence, a *prima facie* case of discrimination. Second, if the plaintiff is able to prove a *prima facie* case, the burden of going forward is shifted to the defendant and the defendant must articulate a legitimate, non-discriminatory reason for its action. Third, should the defendant carry its burden, the plaintiff must prove, again by a preponderance of the evidence, that the reason forwarded by the defendant is not the true reason for the challenged action, but is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802 & 804, 93 S.Ct. at 1824, 1825. The ultimate burden of persuading the court that the defendant intentionally discriminated against the plaintiff rests always on the plaintiff, not on the defendant. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). "Proof of discriminatory motive is critical." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

### A. PRIMA FACIE CASE

Although *McDonnell Douglas* set forth a model Title VII *prima facie* case,[2] the Court recognized that this *prima facie* case was merely a model to be adapted to fit various factual circumstances. *See McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *United States Postal Service Board of Governors v. Aikens*,

460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (*McDonnell Douglas prima facie* case never intended to be rigid, mechanized, or ritualistic). Thus, in cases involving denial of tenure, the Second Circuit has fashioned a *prima facie* format applicable to such cases.

■ Accordingly, to prove a denial of tenure was motivated by a discriminatory animus, a plaintiff must establish that 1) he is a member of a protected group; 2) he was qualified for tenure; and 3) he was denied tenure under circumstances permitting an inference of discrimination. *Zahorik v. Cornell University*, 729 F.2d 85, 92 (2d Cir.1984). *See also Ottaviani v. State University of New York at New Paltz*, 679 F.Supp. 288, 326 (S.D.N.Y.1988).[3]

#### 1. Member of protected group

There is no doubt but that plaintiff has fulfilled the first prong of a *prima facie* case. Plaintiff Noel A. Louis is black, and thus is a member of a racial minority.

#### 2. Qualified for tenure

For the purposes of establishing a *prima facie* case of tenure discrimination, a plaintiff will be deemed "qualified for tenure" where "some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question." *Zahorik*, 729 F.2d at 94. *See also Ottaviani*, 679 F.Supp. at 326.[4] As indicated *supra*, Gor-

---

**2.** The Court in *McDonnell Douglas* stated:
 The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

**3.** The Court is aware that *Zahorik* dealt with university tenure decisions, but finds *Zahorik* apposite here since most of the factors that, according to *Zahorik*, tend to set university tenure decision apart from employment decisions

generally are present in this case: 1) the grant of tenure involved a lifetime personal service contract; 2) the tenure decisions were non-competitive; 3) the number of factors considered in the tenure decisions was quite extensive; and 4) the tenure decisions were a source of disagreement. *See Zahorik*, 729 F.2d at 92–93.

**4.** The Court notes that this formulation is different than that adopted in other Circuits. The First and Third Circuits hold that for a plaintiff to show that he was "qualified for tenure," " 'he need only show that his qualifications were at least sufficient to place him in the middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body.' " *Roebuck v. Drexel University*, 852 F.2d 715, 726 (3d Cir.1988) (quoting *Banerjee v. Board of Trustees of Smith College*, 648 F.2d 61,

don, Superintendant of Bronx High Schools, and Polatnick, Executive Director of the Division of High Schools, both recommended that plaintiff receive tenure. Moreover, Polatnick specifically testified at trial that he "had no reservation" in making the recommendation. Clearly, then, plaintiff has satisfied the "qualified for tenure" prong of the *Zahorik* prima facie case analysis.

### 3. Circumstances permitting an inference of discrimination

█ *Zahorik* indicates that circumstances permitting an inference of discrimination include "[d]epartures from procedural regularity, such as a failure to collect all available evidence ... where the departure may reasonably affect the decision," and "[c]onventional evidence of bias." *Zahorik*, 729 F.2d at 85. *See also Ottaviani*, 679 F.Supp. at 326.

In light of the fact that Chancellor Macchiarola made no tenure decision for any of the 43 principals up for tenure until personnel files were as complete as then possible, the Court finds that there was no procedural irregularity in plaintiff's tenure denial.[5] *Cf. Zahorik*, 729 F.2d at 94. Plaintiff was able to establish only that 1) the personnel files of the tenure candidates, in general and especially from the Bronx, were in a poor state; 2) Chancellor Macchiarola and Quinones did not personally consult with Gordon or Polatnick before plaintiff was denied tenure; and 3) at trial, some 10 years after the fact, neither Chancellor Macchiarola nor Quinones could remember exactly what plaintiff's personnel file contained in July, 1978.

While the first fact goes to the supervisory abilities of Gordon and Polatnick, and while the third fact may bear mute testimony to the disconcerting delay in the Equal Employment Opportunity Commission's issuance of a "right to sue" letter, taken separately or together these facts do not establish procedural irregularity. As to the second fact, Macchiarola and Quinones testified that they were aware of Gordon's and Polatnick's routine recommendations that plaintiff receive tenure. Both men testified that Gordon and Polatnick were not able supervisors, that they therefore discounted Gordon's and Polatnick's recommendations, and that, by the time the tenure decisions were to be made, Gordon and Polatnick had already resigned at Macchiarola's request.

Macchiarola was vested with the authority to make tenure decisions as he saw fit. *See generally Wilson v. Macchiarola*, 79 A.D.2d 638, 639, 433 N.Y.S.2d 814 (2d Dept. 1980). *See also James v. Bd. of Educ. of Cent. School Dist. No. 1 of the Towns of Orangetown and Clarkstown*, 37 N.Y.2d 891, 892, 378 N.Y.S.2d 371, 340 N.E.2d 735 (1975) (aside from unconstitutional purpose or statutory proscription, board of education has unfettered power to terminate employment of probationary employees); *Bergstein v. Bd. of Educ., Union Free School Dist. No. 1 of the Towns of Ossining, New Castle, & Yorktown*, 34 N.Y.2d 318, 322, 357 N.Y.S.2d 465, 313 N.E.2d 767 (1974) (tenure may be denied without a hearing and without stating reasons for denial); *Tischler v. Bd. of Educ. of the Monroe Woodbury Cent. School Dist. No. 1*, 37 A.D.2d 261, 263, 323 N.Y.S.2d 508 (2d Dept.1971) (tenure may be denied despite satisfactory ratings during probationary period). Macchiarola's exercise of his authority to disregard the recommendations of Gordon and Polatnick is not itself evidence of discrimination based on race. *See Zahorik*, 729 F.2d at 95. Furthermore, the alleged "failure" of Macchiarola to ask persons who were no longer employed by the Board, to elaborate upon recommendations of which he was already aware did not constitute "a failure to collect all available evidence" regarding plaintiff's qualifications for tenure. *Cf. Id.* at 85 & 94.

---

63 (1st Cir.) (citations omitted), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981)).

**5.** The Court specifically credits the testimony that no tenure decisions were made for the principals until personnel files as complete as then possible had been assembled. A memorandum submitted as part of plaintiff's case, dated July 10, 1978, from Macchiarola to Quinones, requesting more information on plaintiff and ten other tenure candidates, convinces the Court of the truth of this testimony.

The conditions under which the July, 1978 tenure decisions were made were less than ideal in the sense of the number of candidates and the shortness of time, but the collection and review of plaintiff's personnel file was accorded as much procedural regularity as that given to all the other principals who were up for tenure at that time, and that procedure was adequate based on the evidence adduced at trial. *See Wilson*, 79 A.D.2d at 639, 433 N.Y.S.2d 814 (tenure review procedure utilized by Chancellor Macchiarola in 1978 for review of 500 tenure candidates was adequate, not arbitrary).

As for conventional evidence of bias, plaintiff also attempted to show that Macchiarola's decision not to grant him tenure was an impermissible capitulation to the racist fears of the white parents living in the Throgs Neck area who believed that under plaintiff's leadership the School's student population would become predominantly black and hispanic. The evidence adduced at trial, however, simply does not support plaintiff's assertion. While Quinones and Macchiarola testified that they were aware of, and were influenced by, complaints lodged against plaintiff by parents and teachers, the complaints to which they testified went to plaintiff's ability to control the school and enforce its rules. There was no evidence that these complaints were racially motivated.

Plaintiff also claimed that his being replaced by Leder, a white man, is a circumstance permitting an inference of discrimination. Were this a case dealing with a garden variety employment decision the Court might agree.[6] However, the fourth element of the *McDonnell Douglas* model *prima facie* case—"that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications," 411 U.S. at 802, 93 S.Ct. at 1824—has been excluded from the analysis of tenure cases by *Zahorik*. 729 F.2d at 92. Tenure decisions are a breed apart, due in large part to the nature of tenure itself. Generally, tenure candidates do not compete against each other and tenure decisions are not *quid pro quo* situations nor are they "replacement" situations. Indeed, to say in this *tenure* case that Leder "replaced" plaintiff for the purposes of tenure is inaccurate. For while Leder did take over as principal of the School after plaintiff was denied tenure, Leder himself did not receive tenure until three years later when his probationary period ended. Thus, the Court finds that plaintiff's "replacement" by a white male is not a circumstance permitting an inference of discrimination in this case. In reaching this conclusion the Court expressly takes into account the fact that Leder's credentials (having theretofor been only an assistant principal at a junior high school) may have been facially inferior to plain-

---

6. *See, e.g., Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 43 (2d Cir.1988) (ADEA case) (admonition that it was time to retire, promotion of younger co-worker, and rehire of younger, former co-worker, were circumstances permitting inference of discrimination); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) (§ 1981 case) (where plaintiff was the only minority in his position and received lower salary than a white man in same position with less authority, and where supervisor had been excessively critical, trier of fact in constructive discharge case could find circumstances permitting inference of discrimination); *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 & 119 n. 1 (2d Cir.1984) (ADEA case) (circumstances giving rise to inference of discrimination include that plaintiff was qualified, was discharged, and was replaced by someone younger); *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 919 (2d Cir.1981) (ADEA case) (that plaintiff was rejected despite his qualifications, and that after re-

jection the position remained open and the employer continued to seek applicants of the plaintiff's qualifications, would establish circumstances permitting inference of discrimination); *Neale v. Dillon*, 534 F.Supp. 1381, 1386 (E.D.N.Y.1982) (Title VII gender discrimination case) (circumstances giving rise to inference of discrimination were shown by plaintiff who was competent where she was rejected for promotion and male was promoted to the position while plaintiff was on maternity leave); *Connolly v. Cluett, Peabody & Co., Inc.*, 46 F.E.P.Cas. 86 (S.D.N.Y.1988) [1988 WL 18843] (ADEA case) (evidence that defendant hired younger person to place plaintiff would allow reasonable juror to infer discrimination); *Perry v. Manocherian*, 675 F.Supp. 1417, 1423 (S.D.N.Y.1987) (Title VII race case) (reasonable jury could determine that discharge occurred under circumstances permitting inference of discrimination where there was evidence that similarly situated white employees were treated better).

tiff's, for this "fact" is inconclusive. A mere disagreement over the scholarly worth of tenure candidates is insufficient to raise an inference of discrimination. *Zahorik*, 729 F.2d at 94.

In sum, plaintiff did not establish a *prima facie* case because he failed to prove circumstances permitting an inference of discrimination.[7]

The Court, however, will assume that plaintiff made out his *prima facie* case since defendant successfully articulated a legitimate, non-discriminatory reason for its action. *See Aikens*, 460 U.S. at 715, 103 S.Ct. at 1481 (where defendant does everything that would be required if plaintiff had made out a *prima facie* case, whether plaintiff was successful is no longer relevant).

## B. EMPLOYER'S REBUTTAL

Assuming plaintiff established a prima facie case, the defendant must come forward with a clearly explained reason for its action such that the trier of fact may rationally conclude that the employer's decision was not motivated by discriminatory animus. *Burdine*, 450 U.S. at 257 & 260, 101 S.Ct. at 1095 & 1097. Defendant has met this burden.

The evidence at trial clearly established that Macchiarola believed tenure should only be granted where there were affirmative reasons for granting it. Macchiarola and Quinones explained that plaintiff's record in July, 1978, lacked data regarding quantifiable student achievement and that this was one reason plaintiff was denied tenure.

Moreover, Macchiarola also explained that plaintiff's record not only lacked affirmative reasons *for* granting plaintiff tenure, but that there was information counseling *against* granting plaintiff tenure. Quinones and Macchiarola explained that they both had knowledge of complaints that had been lodged against plaintiff by parents and teachers, and that these complaints were another reason plaintiff was denied tenure.

These two non-discriminatory reasons, were presented at trial in a clear fashion, and are rational reasons for denying plaintiff tenure. Thus, the Court finds that defendant bore its burden of clearly articulating a rational, non-discriminatory reason for denying plaintiff tenure. Defendant showed that it had reasoned doubts about plaintiff's qualifications for tenure, and need not show more. *See Zahorik*, 729 F.2d at 94. Because defendant bore its burden of production, even if plaintiff had made out a *prima facie* case, the presumption of discriminatory motive arising therefrom has been vitiated. *See Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10, and accompanying text. Plaintiff is beholden to persuade this Court that the defendant's proffered reasons are a mere pretext. *See Id.* at 256, 101 S.Ct. at 1095.

## C. PRETEXT

Since the plaintiff bears the burden of persuasion on the whole case, he must show that defendant's proffered explanation of its action is a mere pretext to cover up discriminatory animus. *Id.* The plaintiff may succeed in making this necessary showing "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The latter has been described by the Court of Appeals for this Circuit as a showing that the "asserted neutral basis was so ridden with error" that the employer could not honestly have relied on it, *Lieberman*, 630 F.2d at 65, or a showing that an employer's decision was so lacking in merit as

---

7. In denying defendant's Fed.R.Civ.P. 41(b) motion at trial, the Court was not making a finding that the plaintiff had made out a *prima facie* case; rather, at the close of plaintiff's case the Court felt that plaintiff had not yet had notice of defendant's reasons for denying tenure and had not yet had a chance to demonstrate the pretex- tual character of those reasons. *See Holden v. Commission Against Discrimination*, 671 F.2d 30, 36, (1st Cir.), *cert. denied*, 459 U.S. 843, 103 S.Ct. 97, 74 L.Ed.2d 88 (1982). *Compare Aikens*, 460 U.S. at 714 n. 4, 103 S.Ct. at 1481 n. 4.

to call into question its genuineness, *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988). Ultimately this means that "the district court must decide which party's explanation of the employer's motivation it believes." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482.

The Court finds that the first reason proffered by defendant—i.e., the lack of quantifiable student achievement in plaintiff's personnel file—is not acceptable. The testimony of Quinones and Macchiarola regarding the role played in the tenure decision process by student achievement data was internally inconsistent. While both testified that one of the reasons plaintiff was denied tenure was that his personnel file lacked this data, on cross-examination it became apparent that neither Quinones nor Macchiarola could identify a single tenure candidate whose record did contain such data. Furthermore, it was undisputed that that the printed forms used to evaluate principals did not call for such data. Finally, it was also well established that all the tenure candidates' records were in poor condition. Despite this state of affairs, however, the overwhelming majority of principals did indeed receive tenure. Taken together, these facts convince the Court that the lack of student achievement data in plaintiff's personnel file could not have been the controlling reason that plaintiff was denied tenure.

 However, both Quinones and Macchiarola testified that, at the time the tenure decision was made, they were both aware of complaints lodged against plaintiff by parents and teachers, and that these complaints counseled against the grant of tenure. The Court believes this testimony,[8] thus finding defendant's second reason to be non-pretextual, for the following reasons:

There was no evidence that the complaints were not genuine or baseless. The complaints went to plaintiff's ability to control the School and enforce its rules. Putting aside whether the evaluations written by Gordon were in fact part of plaintiff's personnel file in July, 1978, criticisms in those evaluations calling for improvement of the general school tone, examination and reallocation of school resources for the most effective operation, revitalization of parental and community interaction with the School, improvement of supervision, and review of attendance and "cutting" procedures, support the content of the complaints. *Cf. Lieberman*, 630 F.2d at 65. Furthermore, while plaintiff felt that hostilities directed toward him upon his appointment as principal were inspired by racist fears that under his leadership the School would "tip" in racial composition, there was no evidence that the complaints upon which Macchiarola and Quinones relied were racially motivated. Indeed, the fact that the complaints are supported by evaluations written by Gordon, a black woman, rebuts plaintiff's insinuation that the complaints were racially motivated.

In fact, the Court finds that defendant's decision to deny plaintiff tenure on the basis of the complaints was meritorious. This Circuit has recognized that the granting of tenure is special as it involves the granting of what amounts to a lifetime job. *Zahorik*, 729 F.2d at 92; *Lieberman*, 630 F.2d at 64. Performance that would justify continued employment or even promotion in the workaday world may not justify the granting of tenure. *Lieberman*, 630 F.2d at 64. The courts have allowed those responsible for tenure decisions to be very strict in the evaluation of tenure candidates. *Id.* ("When in doubt, don't" was an appropriately rigorous standard). When the decision to deny a person tenure is reasonably attributable to honest even though partially subjective qualifications, no inference of discrimination can be drawn. *Id.* at 67. *See also Zahorik*, 729 F.2d at 93 (statements of peer judgments

---

8. If an employer articulates several alternative and independent, legitimate, nondiscriminatory reasons for its action, "the falsity of one does not necessarily justify finding the remaining articulated reasons pretextual." *Logue v. International Rehabilitation Associates, Inc.*, 837 F.2d 150, 155 (3d Cir.1988) (citing *Sims v. Cleland*, 813 F.2d 790, 793 (6th Cir.1987)). Here the unacceptability of defendant's first reason does not raise an inference that defendant's second reason is false. *Cf. Roebuck v. Drexel University*, 852 F.2d 715, 734 n. 32 (3d Cir.1988).

may not be disregarded absent evidence that they are a facade for discrimination). The negative comments in plaintiff's evaluations, then, convince the Court that defendant did not so misjudge plaintiff's qualifications as to reveal a discriminatory intent *Cf. Burdine*, 450 U.S. at 259, 101 S.Ct. at 1097.

Finally, statistical analysis of the 1978 tenure decisions buttresses a finding that defendant's second reason is not pretextual. The parties stipulate that of the 43 principals up for tenure in July, 1978, 34 were white and 9 were black; of the 34 white principals, 31 were granted tenure and 3 were denied tenure; of the 9 black principals, 6 were granted tenure and 3 were denied tenure. It is true that while blacks represented 20.93% of the principals up for tenure, they only represented 8.82% of the principals granted tenure. This discrepancy, however, is well within the pale of chance,[9] thus illustrating the weakness of plaintiff's attempted showing of pretext. *See Yowell v. United States Postal Service*, 810 F.2d 644, 650 (7th Cir.1987).

### IV. CONCLUSION

The Court is not called upon, nor does it have the power, to substitute its judgment for that of defendant as to whether plaintiff should have been granted tenure. It was for defendant, and defendant alone, to make that decision. For a rational reason that was successfully articulated at trial, defendant decided to deny plaintiff tenure. Because plaintiff failed to prove a *prima facie* case of discrimination, and, in any case, because plaintiff failed to convince this Court that discriminatory intent in any way motivated defendant's action, the Clerk of the Court is directed to enter judgment for defendant.

SO ORDERED.

9. Given that 20.93% of the 43 principals up for tenure were black, the expected number of blacks among the 37 principals that were granted tenure is approximately 7.7. The observed number is 6. In this case the standard deviation is 2.78 (defined in this type of statistical analysis as the square root of the product of the total number in the sample [43] times the probability of granting tenure to someone who is black [.2093] times the probability of selecting someone who is not black [.7907]). Since the difference between the expected number and the observed number is far less than two or three standard deviations, it is likely that this difference is the product of chance rather than discrimination. *See Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 311 n. 17, 97 S.Ct. 2736, 2743 n. 17, 53 L.Ed.2d 768 (1977); *Woodbury v. New York City Transit Authority*, 832 F.2d 764, 770 (2d Cir.1987). *See also Kirkland v. New York State Department of Correctional Services*, 711 F.2d 1117, 1131 n. 17 (2d Cir.1983) (defining "standard deviation"). *Zahorik*'s discounting of the usefulness of statistics in tenure cases is inapposite here where a single office made all the tenure decisions. *Cf. Zahorik*, 729 F.2d at 92–93 & 95; *Woodbury*, 832 F.2d at 771. Nevertheless, the Court is well aware of the limitations upon the probity of statistical evidence, *see International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396 (1976) (statistics not irrefutable and may be rebutted), and merely uses this evidence to confirm its finding that defendant's second reason is not pretextual.