Oneida ADAMES et alia, Plaintiffs,

v.

The MITSUBISHI BANK,
LTD., Defendant.

No. CV–88–0721.

United States District Court,
E.D. New York.

Aug. 27, 1990.

As Amended Sept. 11, 1990.

Hockert & Flamm, New York City, for plaintiffs.

Epstein Becker & Green, P.C., New York City, for defendant.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This action was originally brought by the individual plaintiffs, Oneida Adames, Mirsada Krlic, Nancy Farinola, and Lisa Poggi, to redress alleged employment discrimination on the basis of race, descent, ancestry, and ethnic characteristics by the defendant, the Mitsubishi Bank, Ltd. (the "Bank"). Plaintiffs' original cause of action was based on 42 U.S.C. § 1981, with jurisdiction predicated upon 28 U.S.C. § 1343(4). On April 29, 1989, this Court granted in part and denied in part plaintiffs' motion for certification of a class under Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (3) and certified a class limited to the Bank's New York branch, consisting of all employees "with a reasonable expectation of promotion or transfer." This matter is now before the Court on defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Since the filing of the Bank's motion, plaintiffs have filed a first amended complaint which partially responds to some of defendant's arguments in favor of summary judgment. On October 6, 1989, plaintiffs also filed a separate action against the Bank alleging claims based on race and national origin discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), coupled with pendent claims of race and national origin discrimination under the New York State Human Rights Law.

The following facts are undisputed, except as noted or where they are described simply as being an allegation, claim or contention. They are primarily drawn from the affidavits and deposition transcripts presented by both sides. The Bank is a Japanese corporation with headquarters in Tokyo, Japan. In the United States, the Bank has branch offices in New York City and Chicago. Offices of the Bank in six other cities—Houston, Los Angeles, San Francisco, Columbus, Portland, Oregon, and Seattle—are referred to by the parties as "agency or representative offices" and apparently perform banking services of a more limited sort than those provided in New York and Chicago.

The Bank's United States branches, particularly in New York, engage in general commercial banking. The offices were initially established to assist the Bank's principal office in Japan to service Japanese corporations engaged in business in the United States. However, over the last ten years the Bank has also sought to provide loans to United States and other non-Japanese corporations. In order to ensure coordination worldwide of the Bank's lending standards, the Bank's head office is consulted regarding decisions whether to provide financing to companies that apply for loans in the Bank's United States offices.

The four named plaintiffs were hired by the Bank to work in its New York office. Three of the named plaintiffs are caucasian/American women; one, Oneida Adames, is of Hispanic/American origin. All four plaintiffs resigned their positions after March 1985, allegedly as a result of defendant's discriminatory practices.

Plaintiff Oneida Adames claims that she was hired to work as an analyst on October 1, 1982, but that her work was in fact that of an administrative assistant during the period of her employment. She claims she was denied promotional and transfer opportunities and that this denial prompted her resignation in July 1987. For her part, Nancy Farinola alleges that she was hired by the Bank on February 3, 1986, with the understanding that she would work as an analyst but instead worked as an administrative assistant. Because of alleged denials of promotional opportunities which she says she sought and was promised, she resigned in June 1987.

Mirsada Krlic claims to have been hired to work as an analyst in New York on August 4, 1986. Until her resignation in October 1987, she too says her work was that of an administrative assistant. During that period, she claims she was denied the promotional opportunities she requested. Finally, Lisa Poggi, employed by the Bank from September 4, 1984, until December 3, 1985, alleges that she was also hired as an analyst but was in fact employed as

an administrative assistant. Although she indicated her desire for transfer or promotion, she claims she was denied such opportunities.

All four named plaintiffs have submitted affidavits alleging discrimination by the Bank. Affidavits of other employees supporting plaintiffs' contentions have also been submitted. All of the affiants claim knowledge of other individuals similarly situated who have been adversely affected by discrimination practiced by the Bank. The affiants also claim to know of no member of their class who achieved a transfer or promotion during the period of the affiants' employment.

According to defendant, the Bank's head office regularly assigns executive and managerial employees from the head office in Japan to overseas offices throughout the world on assignments of limited duration. Due to the temporary nature of their assignments, these individuals are referred to as "rotating staff." Defendant states that salaries paid to rotating staff are determined by the Bank's head office and include compensation for costs associated with living and working in a foreign country. The individuals hired locally by the Bank's offices are referred to as "local" or non-rotating staff. The Bank contends that it hires local staff for both managerial and clerical positions. However, it does not permit local staff to transfer between offices in the United States.

Plaintiffs challenge this practice, which they term the Bank's "dual staff system." Plaintiffs' theory is that, under the guise of its rotating staff system, Mitsubishi in fact practices intentional racial discrimination against persons of non-Oriental ancestry and origin and that these discriminatory practices are not justified by any business necessity or legitimate preference for Japanese citizens. Plaintiffs also contend that the system has resulted in "disparate impact upon and constitute[s] disparate treatment of, all non-Japanese persons employed by the Bank's local staff in its various U.S. Offices."

Plaintiffs have asserted that as of September 30, 1988, only 20 officer positions were allocated to local staff, as compared to 55 officer positions allocated to the rotating staff. Of the twenty officers among the local staff, plaintiffs assert that only one has involved a position higher than the first level of assistant manager. Moreover, of the top 19 positions, 18 were held by the Japanese rotating staff. While defendant has not disputed these numbers, it contends that no specific positions are allocated to the rotating staff and that theoretically a local staff member could become a general manager, the highest post at a branch office.

Plaintiffs assert that the "overhang effect" created by the large rotating staff has significantly impeded the ability of local staff at all levels to achieve promotions or salary increases. In support of this contention, plaintiffs have submitted the affidavits of Bruce McGillivray and Robert Grillo, both of whom worked in the Bank's corporate finance department between 1983 and 1988, McGillivray as a manager and commercial loan officer, Grillo as a loan administrator and then assistant manager. Despite regular requests and satisfactory performance evaluations, McGillivray never received a promotion. For his part, Grillo states that while he was promoted once he was passed over on many occasions in which openings for which he was fully qualified were filled by a Japanese employee who was less qualified. During the same period, every Japanese employee in the corporate finance department received at least one promotion, transfer or job upgrade. An exhibit submitted by plaintiffs indicates that each of the fifty-five rotating officials in the New York City branch during the period 1985 through 1987 received one or more promotions or transfers. Both affiants also recount instances of unequal treatment and responsibility between Japanese and non-Japanese personnel holding the same positions and state that, since their careers were impeded by racial and ethnic bias, they were compelled to resign.

Plaintiffs Farinola and Krlic claim further that, when they protested their lack of advancement to the Bank's management, they were informed that promotional op-

portunities and advancement were reserved for Japanese personnel. Plaintiffs further state that they were told that it was Bank policy not to provide tuition reimbursement for business courses to American employees because they would leave the Bank after acquiring the skills. Farinola and Krlic also complain that "the work environment, being totally controlled by Japanese managers, was infected with frequent racial remarks asserting the lack of ability, loyalty and commitment of non-Japanese personnel."

The Bank defends its use of the rotating staff as legitimate and necessary for business purposes. Defendant asserts that, because the Bank's head office is consulted with respect to loan applications processed by the U.S. branches (both to ensure worldwide coordination and the employment of proven lending standards), it is important that significant numbers of Bank personnel be acquainted with the banking practices, laws, and customs of Japan, as well as those of the United States. According to the affidavit of Hisao Yokoyama, Chief Manager of the Bank's General Affairs Department, because of the need to service Japanese companies and coordinate the Bank's international financing transactions, "knowledge of Japanese business practices and management style, business culture and structure, business customs, and the ability to read, write and speak the Japanese language, are all essential skills for many positions at the [B]ank." However, Yokoyama states that at no time has the Bank's hiring practices been motivated by any racial or ethnic preferences.

Yokoyama's affidavit also states that the Bank's major overseas offices receive rotating staff from Japan who typically have a minimum of seven or eight years experience with the Bank and who have been recruited from elite Japanese universities. They have therefore acquired an in-depth knowledge of the Bank's banking and administrative systems and practices, as well as knowledge concerning the banking industry, regulations, and customers. The rotating staff employees assigned to the New York branch are and, at all relevant times, have been Japanese citizens, virtually all of whom have been admitted to the United States under the "treaty trader" section of the Immigration and Naturalization Act, 8 U.S.C. § 1101(a)(15)(E)(i).

Despite this historical fact, at his deposition Yokoyama averred that there is no restriction that would prevent a person of non-Japanese descent or origin from becoming a member of the rotating staff. However, it would be necessary to acquire knowledge of "Japanese culture, social structure and related Japanese institutions." Yokoyama later qualified this assertion and admitted he didn't know whether knowledge of Japanese business practices is an absolute prerequisite to joining the rotating staff and that he was not familiar with the standards when he was hired.

For his part, Mr. Imagawa (another New York branch officer) also acknowledged that he did not know what a non-Japanese person would need to do to join the rotating staff but that it would be possible if that individual were qualified. He opined that such an individual would have to be well versed in international finance, have proven management skills, and possess the ability to communicate well with Tokyo. Imagawa acknowledged that it may not be necessary to know Japanese if personnel in Tokyo understood English sufficiently. Imagawa further stated that specific positions are not designated only for Japanese personnel and that it is possible that a general manager of a U.S. branch office could be filled by a local staff member.

Defendant's assertions in this respect are contradicted by the affidavit of Patricia Gaiton, who, as manager of personnel between 1984 and her resignation in 1985, was generally responsible for personnel matters affecting the local staff in the New York office. Gaiton asserts that, between 1973, when she was hired, and 1985, the Bank repeatedly assured her that, despite the existence of the rotating staff, it planned to fill a significant number of management positions with non-Japanese personnel. However, "few steps, if any, were taken by the Bank to create growth opportunities in management for members of the Local Staff." Moreover, Gaiton as-

serts that all senior management positions were reserved for the rotating staff and that, because the rotating staff occupied most of the managerial positions, this created a "blocking effect" that made it extremely difficult for members of the local staff to obtain promotions.

Plaintiffs also challenge the Japanese language and skills requirements of the rotating staff as a pretext. Plaintiffs assert that, while the Bank still services many Japanese corporations doing business in the United States, the primary mission of the New York branch has become to provide primary lending for American-based and other non-Japanese corporations. Plaintiffs assert that this is a mission that requires familiarity with United States banking practices and laws, rather than Japanese customs and language.

Plaintiffs also challenge the promotion and hiring patterns within the local staff. Plaintiffs contend that promotions among local staff personnel are given predominantly to persons of Oriental origin or descent. According to Patricia Gaiton's affidavit, "[e]ven among Local Staff personnel, bias in favor of Oriental and Japanese employees existed." In support of this assertion, Gaiton refers to the fact that of the nineteen local staff who were officers in 1985, seven, or 37%, were Oriental or Japanese as against a figure of 20% for the percentage of the total staff represented by persons of Japanese and Oriental extraction. Furthermore, Gaiton asserts that in 1985, five of the seven promotions among non-clerical local staff went to employees of Oriental or Japanese race or ancestry.

The parties dispute the significance of the Bank's hiring patterns between 1985 and 1988 by pointing to slightly different time frames. Plaintiffs assert that, between March 1985 and March 1988, there were only twelve promotions involving local staff officers. Seven of these twelve promotions they say were given to employees of Japanese or Oriental ancestry. For its part, the Bank asserts that between January 1985 and September 30, 1988, seventeen local staff were promoted from clerk to officer level or to higher level officer positions. Ten of these were of non-Japanese or non-Oriental ancestry. Plaintiffs contend these figures are misleading because six of the ten non-Oriental promotions occurred on April 1, 1989, several weeks after their suit was commenced.

The Bank also seeks to show that as of January 1988, the Bank employed 112 local staff employees at the New York office. Twenty-three, or approximately 20% of these were of Japanese or Oriental ancestry. Of a total of twenty local staff officers, four, or 20%, were also of Japanese or Oriental ancestry. Plaintiffs respond that, when both local and rotating staffs are counted, all but 16 of 75 total officer positions in 1988 were still held by employees of Japanese or Oriental background. Plaintiffs further assert that the 20% of local staff that is of Japanese or Oriental ancestry is substantially disproportionate to the approximately 3% of qualified Asian and Pacific Island origin persons available in the greater New York City Standard Metropolitan Statistical Area, as calculated by the U.S. Census Bureau. Plaintiffs' Joint Affidavit also notes that as of September 30, 1988, the Bank had added a net of 32 local staff, for a total of 144.

## DISCUSSION

Summary judgment may be granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any disputed material facts, *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983), and the Court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983). To defeat a motion for summary judgment, however, the opposing party may not rest upon the conclusory allegations or denials set forth in the pleadings but must set forth specific facts showing that there is no genuine issue for trial. Rule 56(e); *Schering, supra*, 712 F.2d at 9. If the evidence

is merely colorable or is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Resolution of defendant's summary judgment motion largely depends on defining the scope of remedies provided by 42 U.S.C. § 1981. Section 1981 provides, in pertinent part:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

Plaintiffs' § 1981 complaint alleges that the defendant has engaged in discrimination based on race, ancestry, and ethnic background in its (a) promotion and transfer policies, (b) administration of employee benefits and perquisites, (c) application of performance standards, and (d) use of deprecatory remarks and ethnic slurs. The suit does not directly challenge defendant's hiring practices.

*Limits Imposed by Patterson v. McLean*

Defendant asserts that the Supreme Court's recent decision in *Patterson v. MacLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which significantly limited the scope of § 1981, now forecloses all of plaintiffs' claims. In *Patterson,* a black plaintiff had challenged her employer for racial harassment, failure to promote, and discharge from employment. The Court ruled that, in contrast to discrimination involving the initial formation of the contract or certain types of promotion, "incidents relating to conditions of employment" are not covered by § 1981. Plaintiff's claims of racial harassment were therefore not actionable. As the Court explained:

> "[T]he right to make contracts does not extend ... to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such post-formation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII."

109 S.Ct. at 2373.

▪ Plaintiffs acknowledge that under *Patterson,* their previously asserted claims alleging a deprecatory work atmosphere are no longer cognizable and have accordingly served and filed, with the Bank's consent, their first amended complaint which omits this claim as a separate cause of action. Plaintiffs' claims regarding discriminatory pay levels and benefits must also be dismissed under *Patterson.* These clearly entail post-contract incidents relating to the conditions of employment and have little relationship to the claims concerning promotion, discussed *infra. Cf. Copperidge v. Terminal Freight Handling Co.,* 50 Fair Empl.Prac.Cas. (BNA) 812, 1989 WL 112829 (W.D.Tenn.1989) (challenge of more rigid disciplinary standard dismissed pursuant to *Patterson* ). Finally, plaintiffs' allegations of discrimination relating to denial of training were explicitly dismissed by *Patterson,* 109 S.Ct. at 2373–74.

In contrast, *Patterson* ruled that a § 1981 discrimination claim for failure to promote was still potentially actionable. As posed by the Court:

> "[T]he question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer.... In making this determination, a lower court should give a fair and natural reading to the statutory phrase 'the same right ... to make ... contracts,' and should not strain in an undue manner the language of § 1981. Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981. *Cf. Hishon v.*

*King & Spalding,* 467 U.S. 69 [104 S.Ct. 2229, 81 L.Ed.2d 59] (1984) (refusal of law firm to accept associate into partnership)."

109 S.Ct. at 2377.

The parameters of the "new and distinct relation" test are still being defined by the federal courts. A small minority has adopted the literal view that, unless the promotion sought would actually entail a new contract or otherwise dramatically alter the past structure of the employer/employee relationship, a plaintiff has no claim. *See, e.g., Crader v. Concordia College,* 724 F.Supp. 558 (N.D.Ill.1989); *Greggs v. Hillman Distrib. Co.,* 719 F.Supp. 552, 554–55 (S.D.Tex.1989) (claim of denial of promotion from sales supervisor to area supervisor did not involve "new contract"). Several other courts have focused on the *Patterson* Court's reference to *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, where a law firm refused to accept an associate into the partnership and whether the promotion at issue entails a comparable change in "status". Thus, in *Williams v. Chase Manhattan Bank, N.A.,* 728 F.Supp. 1004, 1009 (S.D.N.Y.1990), the court held that, while a promotion from assistant manager to assistant treasurer was actionable because it involved a change from being an employee to being an officer, the change from assistant manager to branch manager involved a promotion from one supervisory position to another and was therefore not actionable. *See also* the discussion in *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1311 (7th Cir.1989).[1]

Most courts have adopted a broader, functional approach that examines such factors as whether the promotion entails higher salary, different qualifications, different responsibilities and functions, as well as whether there would be a change in employment status. There is widespread agreement that routine promotions involving simply higher pay or nominal title increases without any concomitant increase in responsibility or authority are barred by *Patterson. Williams v. National R.R. Passenger Corp.,* 716 F.Supp. 49, 51 (D.D.C.1989) (since higher pay is part of almost all promotions, not sufficient under *Patterson* ); *Sofferin v. American Airlines, Inc.,* 717 F.Supp. 597, 599 (N.D.Ill.1989) (promotion that would involve performing the same functions not actionable).

However, where a change in pay or title is accompanied by other significant changes, the *Patterson* test is generally met. Thus, in *Luna v. City and County of Denver,* 718 F.Supp. 854, 856–57 (D.Colo. 1989), the court found the existence of a "new and distinct relationship" where the promotion from project inspector to engineer would have involved substantial changes in supervisory responsibility, duties, and qualifications. Similarly, in *Hudgens v. Harper–Grace Hospitals,* 728 F.Supp. 1321 (E.D.Mich.1990), plaintiff alleged an actionable claim where the promotion from supervisor of computer operations to the technical position of telecommunications analyst involved different pay, qualifications, and responsibilities. *See also Mallory v. Booth Refrigeration & Supply Co.,* 882 F.2d 908, 910 (4th Cir. 1989) (new and distinct relationship test met where promotion from clerk to supervisor involved increase in responsibility and pay); *Miller v. Shawmut Bank of Boston,* 726 F.Supp. 337 (D.Mass.1989) (promotion to personal banker from customer services representative sufficient to save § 1981 claim from summary judgment).

Defendant asserts that, because no promotions within the Bank entail new employment agreements or any formal agreements at all, none are actionable under § 1981. The Bank further claims that, because advances within the clerk or officer level do not involve any change in the terms or conditions of employment other than change in title, receipt of pay increase, and in some cases, work tasks, none

---

1. As Judge Posner noted in *Malhotra,* 885 F.2d at 1311:

 "The Court's reference to contract and its citation to *Hishon* suggest that in deciding whether a promotion would create a 'new and distinct relation between the employee and the employer,' the focus of inquiry should be on whether the promotion would change the terms of the contractional relationship."

of these promotions meet the *Patterson* test.

For their part, plaintiffs claim that there is a vast spectrum of actionable promotional opportunities at all levels of the Bank, including (1) promotions between different levels of clerk or non-management staff, (2) promotions from the clerk to management level, and (3) promotions within the management staff. As examples of such actionable promotions, plaintiffs point to, *inter alia*, the change from mailroom clerk to mailroom coordinator, the change from General Clerk D to General Clerk A, the change from General Clerk A to Assistant Manager, the change from Administrative Assistant to Assistant Manager, the change from Assistant Manager to Manager, the change from Assistant Trader to Trader, and so on up the line.

 Contrary to plaintiffs' suggestion, routine "single-jump" promotions involving only higher pay or title increases are not actionable under *Patterson*. Thus, a change in the grade of a bank clerk or manager, without a significant change in responsibility or duties, would clearly be barred. However, at least some of the promotions cited by plaintiffs, particularly those involving transfers from clerk to managerial status, appear to be actionable. Defendant has not met its burden of proof in this regard and has failed to submit proof that would demonstrate that the specific promotions to which plaintiffs have referred would not amount to a new and distinct relationship under *Patterson*.

 Plaintiffs also claim discriminatory treatment with respect to the Bank's evaluation practice and its policy of denying transfers to the local staff. To the extent that the alleged exposure to tougher evaluation standards was an integral part of defendant's discriminatory refusal to promote the plaintiff class, this claim appears actionable. However, a request for a transfer to a comparable position in a new location does not generally entail any increase in pay, authority or responsibility and is not actionable under *Patterson*. *Lynch v. Belden & Co.*, 882 F.2d 262, 267 (7th Cir.1989); *cf. Dangerfield v. Mission*

*Press*, 50 Fair Empl.Prac.Cas. (BNA) 1171, 1989 WL 88199 (N.D.Ill.1989).

### Retroactive Application of Patterson

 Plaintiffs contend that, to the extent *Patterson* affects their § 1981 action, it should not be applied retroactively to preclude any of their claims. While there is a general presumption that decisions will be applied retroactively, *see Solem v. Stumes*, 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984), this presumption can be overcome. In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971), the Supreme Court established that the court should balance: (1) whether a judicial principle "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed"; (2) whether retroactive operation will advance or retard the purpose and effect of the new rule, in light of its history; and (3) whether applying the statute retroactively will produce "substantial inequitable results." *Id.* at 106–07, 92 S.Ct. at 355–56.

With respect to the first prong, several courts have ruled that *Patterson* did not announce a new rule of law but simply clarified the application of section 1981 by giving a fair reading to its statutory language. *See, e.g., Morgan v. Kansas City Area Transp. Auth.*, 720 F.Supp. 758, 760–61 (W.D.Mo.1989). However, most courts have determined either that *Patterson* decided an issue of first impression whose resolution was not clearly foreshadowed, *see Prather v. Dayton Power & Light Co.*, 1989 WL 103737 1989 U.S.Dist. LEXIS 10756 (S.D.Ohio 1989), or else that *Patterson* overturned clear precedent within their circuits. *Thomas v. Beech Aircraft Corp.*, 52 Fair Empl.Prac.Cas. (BNA) 137, 1989 WL 110848 (D.C.Kan.1989); *Brackshaw v. Miles, Inc.*, 723 F.Supp. 60 (N.D.Ill.1989). In this respect, *Patterson* clearly reversed Second Circuit authority allowing § 1981 claims for hostile working environment and harassment, *see Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987).

However, where, as here, the Supreme Court itself "has given retrospective application to a newly adopted principle, 'no sound reason exists for not doing so here.'" *Welyczko v. U.S. Air, Inc.*, 733 F.2d 239, 241 (2d Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984) (quoting *Holzsager v. Valley Hospital*, 646 F.2d 792, 797 (2d Cir.1981)); *see also Gonzalez v. Home Ins. Co.*, 909 F.2d 716 (2d Cir.1990). Moreover, plaintiffs have not submitted sufficient reasons under the *Chevron* balancing test to avoid retroactive application.

With respect to the second *Chevron* factor, plaintiffs submit that their case is one in which no worthwhile purpose will be served by applying *Patterson* retroactively, since their claims relating to unequal treatment in compensation, fringe benefits, and perquisites are closely related to their claims relating to promotion and inability to join the rotating staff. This argument is hardly persuasive. *Patterson* intentionally limited the scope of section 1981 in order to preserve the separate statutory scheme for remedying workplace discrimination set forth in Title VII, which requires filing and processing by the EEOC and which provides for more limited remedies. *Patterson*, 109 S.Ct. at 2374–75; *Brackshaw v. Miles, supra*, 723 F.Supp. at 62. Because plaintiffs' claims alleging discriminatory compensation and benefits is now only actionable under Title VII, allowing plaintiffs to proceed with these claims under section 1981 would clearly retard the purpose of the new rule.

Plaintiffs' claim of substantial hardship should *Patterson* be applied must also be rejected. The fact that plaintiffs commenced this class action in March 1988, fifteen months prior to the Supreme Court's decision, has not resulted in any discernable prejudice. Plaintiffs may still claim discriminatory conditions and benefits under their Title VII claim, while discovery on this issue may be submitted to prove certain aspects of the § 1981 promotion claim. *Morgan v. Kansas City, supra*, 720 F.Supp. at 760. Moreover, the fact that significant time may have been wasted on discovery has been expressly rejected by this circuit as a bar to retroactive application of *Patterson*. *See Gonzalez, supra*. Finally, plaintiffs' reliance on *Gillespie v. First Interstate Bank of Wisconsin*, 717 F.Supp. 649 (E.D.Wis.1989), one of the few decisions that has refused to apply *Patterson* retroactively, is misplaced. The hardship in *Gillespie*, where plaintiffs had already been awarded section 1981 damages after a lengthy trial, was far more substantial than the current situation. *Cf. Thomas v. Beech Aircraft, supra* (prejudice found largely due to long trial delay).

### Racial Discrimination under § 1981

Plaintiffs have challenged both the Bank's "dual staff system" as well as alleged discrimination within the local staff. Plaintiff's theory is that, under the guise of its rotating staff system, Mitsubishi in fact practices intentional racial discrimination against persons of non-Oriental ancestry and national origin with no justification based on business necessity. Moreover, they contend that promotions among local staff personnel are given predominantly to Oriental persons for invidious discriminatory reasons. Defendant asserts that plaintiffs' complaint is in fact based solely on the Japanese citizenship or national origin of its rotating staff and that plaintiffs have failed to show any intentional, racially based discrimination as required under § 1981.

Although § 1981 does not itself use the word "race," the Supreme Court has construed the statute as forbidding all "racial" discrimination in the making of private as well as public contracts. *Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976). The prohibition against racially discriminatory employment practices and policies includes discrimination on the grounds of ancestry or ethnic characteristics and has been held to encompass alleged discrimination against a white person in favor of another race. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

It is clear that an individual or class cannot sustain an action under section

1981 that claims discrimination solely on the basis of national origin. Thus, the court in *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731 (5th Cir.1986), held that a white employee of a British corporation could not sue for discrimination based on the fact that he was an American. Similarly, the court in *Rios v. Marshall*, 530 F.Supp. 351 (S.D.N.Y.1981), dismissed a section 1981 claim brought by black and Puerto Rican workers after determining that their complaint that black Jamaicans had been preferred involved discrimination based on citizenship, and not racial animus. *See also Budinsky v. Corning Glass Works*, 425 F.Supp. 786 (W.D.Pa.1977) (dismissing section 1981 claim alleging discrimination based on Slavic national origin); *Kurylas v. Dep't of Agriculture*, 373 F.Supp. 1072 (D.D.C.1974) (action claiming discrimination based on Polish American national origin dismissed).

■ However, the Supreme Court recently established that so long as a plaintiff can prove that he was subjected to intentional discrimination based on his race, ethnic characteristics or ancestry, "rather than solely on the place or nation of his origin," he has an actionable claim under § 1981. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987). *Saint Francis* therefore indicates that section 1981 claims may be maintained even though national origin and/or citizenship concerns may have provided part of the motive for the discriminatory activity.

■ In the present case, plaintiffs claim that they have suffered racial discrimination because of their status as non-Orientals and not just because of their American citizenship. In this situation, the Court is faced with the difficult task of discerning whether the Bank's acknowledged preference for Japanese executives, at least in the rotating staff, is based solely on citizenship or is also driven by racial animus. A number of courts have recognized that "the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible." *Enriquez v. Honeywell, Inc.*, 431 F.Supp. 901, 904 (W.D.Okla.1977).

Courts have most often confronted this dilemma in situations involving a class of hispanics, who, although technically considered "caucasian," may be subject to "racial" prejudice as an ethnically identifiable subgroup. Most courts have concluded that section 1981 permits such claims and should not be limited to a technical or restrictive definition of race. *See, e.g. Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971–72 (10th Cir.1979).[2] Thus, in *Cubas v. Rapid Am. Corp.*, 420 F.Supp. 663 (E.D.Pa.1976), the court addressed the issue of a Cuban-born citizen claiming discrimination on the basis of race:

"National origin discrimination is actionable only to the extent that it is motivated by or indistinguishable from racial discrimination.... Hispanic Americans claiming that they have been discriminated against in violation of § 1981 are entitled to introduce evidence to prove that the alleged discrimination was racial in character.... We cannot find, as a matter of law, that the alleged discrimination against the plaintiff as a Cuban American did not contain elements of racial discrimination."

420 F.Supp. at 665–66; *accord Enriquez v. Honeywell, supra; Rodriguez v. Chandler*, 641 F.Supp. 1292 (S.D.N.Y.1986).

The case before this Court is both simpler and more complex than the above cases involving hispanic plaintiffs. On the one hand, a class of blacks or a class of whites or a class of hispanics can definitely claim discrimination in favor of a group of Orientals, since all are well-recognized races or ethnic groups. However, here a class made up of whites, blacks and hispanics is claiming favoritism toward a group of Orientals. Moreover, most of these Orientals are a distinct nationality, Japanese. It would therefore not be difficult to characterize plaintiffs' claim as one based on citi-

---

**2.** As the Tenth Circuit explained, "[p]rejudice is as irrational as is the selection of groups against whom it is directed. It is thus a matter of practice or attitude in the community, it is usage or image based on the mistaken concepts of race." 593 F.2d at 971.

zenship rather than race. This was the conclusion reached by the district court in *Avigliano v. Sumitomo Shoji America, Inc.*, 473 F.Supp. 506 (S.D.N.Y.1979), *vacated and remanded on other grounds*, 638 F.2d 552 (2d Cir.1981), *rev'd and remanded on other grounds*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), where a class of secretaries claimed discrimination against a Japanese company because it favored Japanese males. The court dismissed the section 1981 claim after determining that plaintiffs could not equate claims that they were discriminated against as non-Japanese nationals with discrimination based on race.

However, at least two courts have held that plaintiffs made an actionable § 1981 claim in similar circumstances. In *Spiess v. C. Itoh & Co.*, 408 F.Supp. 916 (S.D.Tex. 1976), a class of white American citizens filed suit on behalf of themselves and all other non-secretarial personnel of non-Japanese national origin who had been discriminated against by a Japanese-owned corporation. Recognizing that in this situation "national origin" discrimination was indistinguishable from "racial" discrimination, the court held that three white Americans had standing to sue under § 1981 to vindicate the rights of a class of non-Oriental, non-Japanese persons that included non-white citizens.

Similarly, in *Bullard v. Omi Georgia, Inc.*, 640 F.2d 632 (5th Cir.1981), black and white employees alleged discrimination when they were fired by a Japanese manager and replaced by employees whose race was Oriental and whose national origin was Korean. Plaintiffs' affidavits charged they had been discriminated against on the basis of both race and national origin. The court denied defendants' motion for summary judgment, noting that summary judgment is always questionable in employment discrimination cases involving motive and intent, particularly where the issue is national origin versus race:

> "Appellants have stated and supported a case of racial discrimination. The line between national origin discrimination and racial discrimination is an extremely difficult one to trace. An attempt to make such a demarcation before both parties have had had an opportunity to offer evidence at trial is inappropriate."

640 F.2d at 634–35.

 Although plaintiffs in the present case have clearly stated an actionable claim under section 1981, alleging racial as well as national origin discrimination, the Bank challenges whether they have made a sufficient showing of racial discrimination for purposes of summary judgment. In order to prevail under § 1981, plaintiffs must prove purposeful discrimination. *Patterson*, 109 S.Ct. at 2377. As in Title VII cases, the plaintiffs have the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. *Id.* at 2378, *citing to Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). In the case of an individual plaintiff, she must show that she applied for and was qualified for an available position, that she was rejected, and that after she was rejected the employer either continued to seek applicants for the position or filled the position with an employee of another race. *Id.*

 However, application of the above burden of proof, which defendant claims has not been met, is not required in a class action. In this context, plaintiffs can establish a prima facie case of discrimination against individual class members by demonstrating that "unlawful discrimination has been a regular procedure or policy followed by an employer." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977). The occurrence of sporadic or isolated discriminatory acts is not sufficient; plaintiffs must demonstrate that such discrimination is "standard operating procedure." *Coser v. Moore*, 739 F.2d 746, 749 (2d Cir.1984); *Ottaviani v. State University of New York at New Paltz*, 679 F.Supp 288, 297 (S.D.N.Y.1988). A finding of classwide discrimination creates a rebuttable presumption in favor of individual claims of discrimination. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 772, 96

S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976); *Teamsters, supra,* 431 U.S. at 359 & n. 45, 97 S.Ct. at 1866 & n. 45.[3]

This circuit has indicated that, once a plaintiff class has made out a prima facie case of disparate treatment, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the challenged practices. *Ste. Marie v. Eastern Railroad Assoc.,* 650 F.2d 395, 399 (2d Cir.1981), *quoting Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. If the defendant satisfies this burden, plaintiffs then have the burden of proof to show that the stated reason was in fact a pretext. *Id.*

■ Plaintiffs may sustain their burden of establishing a prima facie case through introduction of direct evidence, such as statements by the employer that race was a reason for discrimination, or through proof of circumstances from which an inference of discrimination may be drawn. *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir.1984) (ADEA case). Plaintiffs may also employ statistical evidence to establish a pattern or practice from which an inference of discrimination can be drawn. *Id.; Coser v. Moore, supra,* 739 F.2d 746; *Simpson v. Midland–Ross Corp.,* 823 F.2d 937 (6th Cir.1987).[4]

Plaintiffs have attempted to establish a pattern and practice of discrimination at the Bank with respect to (1) the distinction between the rotating and local staff and (2) with respect to the alleged favoritism toward employees of Oriental or Japanese ethnicity within the local staff. Whereas evidence on the first question is largely based on affidavits and deposition testimo-

ny, the evidence relating to the second is primarily statistical.

■ Plaintiffs have established a prima facie pattern of discrimination based on distinctions between the local and rotating staff. Despite Yokoyama's protestation that being Japanese or Oriental is not a requirement to join the rotating staff, it would appear very difficult for a non-Oriental or non-Japanese employee to do so. Moreover, the records indicates that the Japanese in the rotating staff have far more promotion opportunities than similarly situated employees in the local staff. Plaintiffs have also made a prima facie case that the Bank has an implicit policy of reserving all high level positions in the New York office and most management positions for Japanese employees. While Japanese language and business skills may well be a legitimate requirement for many of these positions, for the purposes of summary judgment, the Bank has not demonstrated that there is a legitimate business reason that the vast majority of management positions be reserved for the rotating staff. Plaintiffs have therefore raised a material issue of fact as to whether this requirement is legitimate or a pretext.

■ Plaintiffs have also raised a material issue of fact as to whether the Bank has discriminated against non-Oriental members of the local staff. Plaintiffs have submitted several affidavits attesting to such discrimination, including one from the former manager of personnel, which the Bank has not sufficiently refuted for purposes of summary judgment. The statistical evidence of past promotion patterns also tends to support plaintiffs' claims of discrimination.[5]

---

**3.** If the class claims are unsuccessful, individual claimants may still pursue their actions, but they must satisfy burden of proof for separate claims. *Ottaviani, supra,* 679 F.Supp. at 297.

**4.** As the Supreme Court has pointed out in the context of Title VII:

"Statistics showing racial or ethnic imbalance are probative ... because such imbalance is often a telltale sign of purposeful discrimination.... Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant."

*Teamsters v. United States,* 431 U.S. at 340 n. 20, 97 S.Ct. at 1857 n. 20.

**5.** However, it should be noted that plaintiffs' attempts to demonstrate discrimination against non-Orientals in the local staff on the basis of statistical evidence has not been highly persuasive. Plaintiffs have established that, between March 1985 and at least March 1988, Orientals on the local staff enjoyed a disproportionately higher promotion rate than non-Orientals. However, the Second Circuit and other courts have instructed that in order to show discriminatory promotion practices it is neces-

The Bank's contention that its employment and promotion practices are solely based on a legitimate preference for Japanese citizens may well be proved correct.[6] However, where neither side has established whether the Bank's differential treatment is based on the fact that plaintiffs are "Americans," an impermissible citizenship claim, or that they are "non-Oriental," a permissible section 1981 claim, summary judgment is inappropriate. Given the inherent difficulty in distinguishing between discrimination based upon national origin or citizenship and that based upon race, plaintiffs should have an opportunity to prove their claim at trial. *Bullard, supra*, 640 F.2d at 634–35. Moreover, where the determination of racial animus will hinge on inference and credibility, this circuit has repeatedly noted that the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought and that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989);[7] *see also Montana v. First Federal Savings and Loan Assoc. of Rochester*, 869 F.2d 100 (2d Cir.1989).

### Friendship Treaty

■ The Bank additionally argues that its unincorporated New York branch office is expressly permitted to employ Japanese citizens hired in Japan in certain positions under the Treaty of Friendship, Commerce and Navigation between the United States and Japan, 4 U.S.T. 2063 (the "Treaty"). Article VIII(1) of the Treaty provides in relevant part:

> "Nationals and companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice."

*Id.* at 2070.

This circuit has held that the employment of foreign nationals in executive positions is immune from attack by American employees where the sole basis for challenging the foreign company's actions is discrimination based on the citizenship of the foreign nationals. *Avigliano v. Sumitomo Shoji America, Inc.*, 638 F.2d 552, 558–59 (2d Cir.1981), *vacated and remanded on separate grounds*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982).[8] *See also MacNamara v. Korean Air Lines*, 863

---

sary to take into account the relevant pools of qualified applicants for promotion within the workforce. *Coser v. Moore*, 739 F.2d 746, 750 (2d Cir.1984). Thus, it is not enough to show that more Orientals were promoted proportionately to non-Orientals without evidence that both pools were equally qualified (i.e., in terms of educational background and prior training) for the higher positions. *Ste Marie, supra*, 650 F.2d at 400–01; *Lewis v. NLRB*, 750 F.2d 1266 (5th Cir.1985). Finally, the fact that this evidence concerns a relatively small sample size tends to detract from its probative value. *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333–34, 39 L.Ed.2d 630 (1974); *Simpson, supra*, 823 F.2d at 943; *Haskell, supra*, 743 F.2d at 121. While the promotion ratios for the local staff, if properly analyzed, may be highly probative of racial discrimination, the raw data that has been thus far presented does not go very far in establishing a prima facie case of racial discrimination within the local staff.

6. In this respect, plaintiffs' position is weakened by the frequent references in their own affidavits to discrimination against "American" employees or favoritism toward "Japanese" employees.

7. In *Ramseur*, this Circuit recently set forth the appropriate analysis for summary judgment in a disparate treatment case:

> "In assessing the inferences to be drawn from the circumstances of the termination, the court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that the firing is for a reason expressly forbidden by law. *Thornbrough v. Columbus & Greenville Railroad Co.*, 760 F.2d 633, 638 (5th Cir.1985).... Thus, the absence of direct or explicit evidence that a challenged personnel action was motivated by race is not fatal to a claim of race discrimination."
>
> 865 F.2d at 464–65.

8. Contrary to defendant's assertions, the Second Circuit's decision in *Avigliano* is still controlling law. Because the Supreme Court's decision in *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), was reversed and remanded on separate grounds, the Second Circuit's ruling on this issue remains valid.

F.2d 1135 (3d Cir.1988). However, this circuit and most others have determined that "[t]he right of Japanese firms operating in the United States under the Treaty to hire executives 'of their choice' does not give them license to violate American laws prohibiting discrimination in employment." *Avigliano, supra,* 638 F.2d at 558; *MacNamara, supra,* 863 F.2d at 1140.

In the context of Title VII suits, the courts are divided over whether the Treaty's protection of the employment of foreign nationals poses a conflict with Title VII's prohibition on discrimination based on national origin. Because the *MacNamara* court believed that a clear distinction can be drawn between discrimination based on citizenship (protected by the Treaty and non-actionable under Title VII) and that based on national origin (actionable under Title VII), it determined there was no conflict. 863 F.2d at 1146. In contrast, the *Avigliano* court determined that, while there was theoretically no conflict between the Treaty and Title VII, the Treaty should not be allowed to infringe any Title VII rights. It thus held that a company seeking to justify the employment of foreign nationals under the Treaty would be required to meet a modified version of Title VII's "bona fide occupation qualification" exception. 638 F.2d at 559.

Because section 1981 only proscribes racial and not national origin discrimination and does not contain an explicit "bona fide occupation qualification" exception, plaintiffs' invitation to extend the *Avigliano* test to the present case is denied. (However, this issue will have to be addressed at some point in plaintiffs' Title VII suit). Since the Treaty allows the Bank to employ managers in its New York branch office on the basis of their Japanese citizenship but not on the basis of race or ethnic characteristics, the parties' obligations under the Treaty must conform to those imposed by section 1981.

*Disparate Impact Claim*

█ Plaintiffs' initial papers appeared to contend that the Bank's discriminatory practices resulted in a disparate impact upon, as well as disparate treatment of, all non-Japanese or non-Oriental personnel.[9] As discussed above, plaintiffs must prove purposeful or intentional discrimination in order to prevail under § 1981. *Patterson,* 109 S.Ct. at 2377. Because a claim under the disparate impact theory addresses practices that are "neutral on their face, and even neutral in terms of intent," *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), the Supreme Court has established that disparate impact claims are not actionable under § 1981. *General Building Contractors Assoc. v. Pennsylvania,* 458 U.S. 375, 386–91, 102 S.Ct. 3141, 3147–50, 73 L.Ed.2d 835 (1982). Accordingly, to the extent plaintiffs assert disparate impact claims under this § 1981 suit, such claims are dismissed.

*Decertification of Class*

Finally, defendant asserts that, even if the complaint is not dismissed, the class should be decertified. In the Memorandum and Order dated April 27, 1989, this Court found it appropriate to certify:

> "a class of non-Oriental persons not citizens of Japan who are or were employees of the defendant in defendant's New York office and who have or had a reasonable expectation of promotion or transfer and have been adversely affected in their employment status by reason of practices, policies or customs of the defendant in effect on or after March 9, 1985, which discriminate on the basis of ancestry, race or ethnic background."

*Adames v. Mitsubishi,* 133 F.R.D. 82, 92 (E.D.N.Y.1989).

The Bank argues that because *Patterson* must limit plaintiffs' claims under § 1981 to only those parties who can demonstrate they have been denied promotions to positions representing a "new and distinct relation," plaintiffs must identify sufficient

---

**9.** However, plaintiffs' reply memorandum states they are not making any disparate impact claim under section 1981.

parties who fit this requirement. Because the named plaintiffs have not specifically identified anyone other than themselves who was even allegedly denied a promotion, defendant asserts that they have failed to make a sufficient showing of numerosity under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs contest this assertion and have submitted a list of more than sixty former or current Bank employees who they claim have been denied significant promotions.

 A court's decision to certify a class under Rule 23(c)(1) is not irreversible and may be altered or amended at a later date. 7B C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1785, at 129 (2d ed. 1986). However, there is no requirement that the court alter its class action order when the circumstances surrounding its initial determination change. *Id.* at 136. Moreover, the Court should exercise its power to alter or amend its class action determination with great care for the due process rights of the absent class members. *Id.* at 137.

 As this Court noted in its decision certifying the class, plaintiffs are not required to establish the precise number of the purported class. 133 F.R.D. at 89; *Somerville v. Major Exploration, Inc.,* 102 F.R.D. 500, 503 (S.D.N.Y.1984). Whether the numerosity requirement is satisfied depends upon the facts of each case. 7A Wright, Miller & Kane § 1762, at 195. Factors to be considered in deciding whether numerosity is such that "joinder of all members is impracticable" include the number of parties involved, the inconvenience of trying individual suits, and the size of the individual claims. *Id.* at 188, 192.

In late 1988, plaintiffs asserted that the number of current and former non-clerical management and management-oriented employees in the Bank's New York branch was approximately 96. If current and former "clerical but growth-oriented employees" were included in the class composition, that number rose to 142. Plaintiffs now assert that the relevant number of current and former employees who "have or had a reasonable expectation of promotion or transfer" is even higher due to recent additions to the local staff. In opposing the original certification, defendant asserted that the number of employees in the New York office with a "reasonable expectation of promotion" employed between 1985 and April 1989 was 30. Defendant's estimate, however, was based upon the Bank's current evaluations of the employees' ability, experience in banking, and level of education and, hence, limited the class to those who were immediately promotable or transferable, a narrower group than plaintiffs sought to represent.

In its Memorandum and Order dated April 27, 1989, this Court stated:

"Federal courts have not set a specific number which will satisfy the numerosity requirement. One hundred forty-two members are clearly sufficient to satisfy the numerosity requirement. In appropriate cases, classes between 30 and 50 have been certified. The real issue is whether the individual joinder of each class member is a more practicable alternative. Since here a number of putative members are current employees, the concern for possible employer reprisal action exists and renders the alternative of individual joinder less than practicable. Since the economic stakes may vary from considerable for those like the named plaintiffs who have resigned to negligible for those who have just entered on employment, the numbers are sufficient to persuade the Court that joinder is not a practical alternative."

133 F.R.D. at 90.

The above rationale is still applicable. Moreover, while the application of *Patterson* has limited the class to those plaintiffs who can ultimately prove that they were denied the opportunity for a promotion that would have involved substantial changes in supervisory responsibility, duties or qualifications, *see* discussion, *supra,* defendant has not established that this requirement has significantly reduced the size of the class initially certified. Defendant's motion to decertify the class is therefore denied subject to the Court's ongoing supervision.

For the foregoing reasons, defendant's motions for summary judgment and decertification of the class are denied.

SO ORDERED.